# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:18-CR-00484-ELR-JFK |
| RAKIM COLEMAN, DAVID YEAKEY and ARTHUR BOYD, | |
| Defendants. | |

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Rakim Coleman's motion [Doc. 59] to suppress cell phone evidence; motion [Doc. 60] to suppress evidence seized pursuant to federal order for Facebook data; motion [Doc. 61] to suppress evidence seized pursuant to search warrant for Facebook account; motion [Doc. 62] to suppress cell site location information; and motion [Doc. 66] to suppress evidence seized from 5812 Coppock Lane.  Also pending before the court are Defendant David Yeakey's motion [Doc. 63] to suppress information for Facebook account without a search warrant and motion [Doc. 65] to suppress evidence obtained pursuant to a warrantless vehicle search.  With respect to Defendant Coleman's motion [Doc. 61] to suppress evidence from his Facebook account, the Government has informed the court and Defendant that, without conceding the merits of the motion, it will not use any of the private

communications or private content from Defendant's Facebook account at trial but reserves the right to use any public content that Defendant posted to his publicly available Facebook page and asserts that the motion can be denied as moot.  Defendant has not provided any response to the Government's notice.  Accordingly, the court will recommend that Defendant's motion [Doc. 61] be **DENIED** as **MOOT**.

### Defendant Yeakey's Motion to Suppress Evidence - Vehicle Search

Defendant seeks to suppress evidence, a firearm and controlled substances seized without a search warrant from a Chevy Suburban on March 1, 2018.  [Doc. 65]. An evidentiary hearing was held on the motion to suppress on November 5, 2019. [Doc. 79].[1]  The Government first contends that Defendant, who had been driving the vehicle but was not the registered owner of the vehicle, lacks a reasonable expectation of privacy in the vehicle and cannot challenge the search.   Alternatively, the Government argues that the Chevy Suburban was lawfully searched pursuant to the impound and inventory policy introduced into evidence.  [Doc. 81].  In response and in support of his motion to suppress, Defendant argues that, based on the evidence introduced at the hearing, he established a reasonable expectation of privacy in the

---

[1]Citations to the evidentiary hearing transcript are:  (Tr. at ).

vehicle and that the Government did not establish that the vehicle was lawfully impounded and that, therefore, the inventory search was unlawful. [Doc. 84]. After consideration of the totality of the circumstances, the court will recommend that the motion [Doc. 65] to suppress be denied.

## I.   Facts

On March 1, 2018, Special Agents with the Federal Bureau of Investigation ("FBI") and members of the Indianapolis Metropolitan Police Department ("IMPD") effected the arrest of Defendant Yeakey based on arrest warrants for armed robbery issued by Bibb County and Bartow County, in Georgia. (Tr. at 4). According to Agent Leonard Rothermich, FBI, Defendant was located by his cellular telephone being "pinged" as authorized by a search warrant. (Tr. at 5). Defendant was first observed, on March 1, 2018, at a single, family residence located at 745 Arnolda Avenue, Indianapolis. (Tr. at 5-6). Around 11:00 to 11:30 a.m., agents and officers conducting surveillance at the residence observed two black males exit the residence, enter a black 1994 Chevy Suburban and leave the residence; the driver of the vehicle was later determined to be Defendant Yeakey.[2] (Tr. at 5-8). The passenger was later determined

_____

[2]Agent Rothermich also testified that March 1, 2018, was the first time that surveillance was established trying to locate Defendant Yeakey. (Tr. at 5, 28). On cross-examination, the agent testified, explaining a statement in the case report, that

3

to be Sheridan Kennedy. (Tr. at 8). The Chevy had a valid temporary tag and was registered to a Kevlynn Maddox. (Tr. at 8).

The Chevy Suburban was followed to a strip mall where it parked in front of the VIP Wireless store and both males exited and entered the store.[3] (Tr. at 5, 7, 11). Agent Rothermich stated that, once he entered the store, he determined that the black male driving the Chevy was Defendant Yeakey, which was confirmed when Defendant identified himself. The agent placed Defendant under arrest. The keys for the Chevy were in Defendant's possession. (Tr. at 7-8, 10, 17). Kennedy, seventeen years old with a valid driver's license, was briefly detained to confirm his identity and then released. (Tr. at 8-9). Defendant was not asked for consent to search the Chevy. (Tr. at 10, 13).

---

earlier the same morning "a male matching [Defendant's] description [must have been seen] arriving to" the residence in the Chevy Suburban. (Tr. at 28). The agent also testified that, at the time of Defendant's arrest or later, there was no report that the Chevy was stolen and that he never found out how Defendant obtained access to the Chevy. (Tr. at 28-29).

[3]The Chevy was parked on private property, in a designated parking space, and was not impeding traffic. (Tr. at 11-12).

AO 72A
(Rev.8/82)

IMPD Detective/FBI Task Force Officer ("TFO") Daniel Cherry made the decision to impound the vehicle pursuant to police department policy.[4] (Tr. at 20-21). Kennedy was not allowed to drive the vehicle because he was not the registered owner. (Tr. at 14, 21-22). TFO Cherry also stated that officers were unable to make contact with the registered owner. (Tr. at 22). No one employed by the VIP Wireless store requested that the Chevy be towed. (Tr. at 17-18). TFO Cherry identified the IMPD impound policy which specifies in pertinent part as follows. (Tr. at 20-21; Gov't Exhibit 2).

**DEFINITIONS**

<u>Public Nuisance</u> - Section 611-203 . . . provides that a vehicle may be declared a public nuisance if any of the following circumstances exist:

- Any vehicle the operator of which is unable to move such vehicle by reason of his incapacity from injury or arrest; . . .
- Any vehicle upon which there is a police force hold; . . . .

_____

[4]IMPD officers controlled the scene of the arrest. (Tr. at 16). Agent Rothermich agreed with the decision to impound the Chevy. (Tr. at 15, 20-21). Because the registered owner was not present and Defendant was under arrest, Agent Rothermich testified that "under IP [Impound] policy we would tow the vehicle off the parking spaces of the business. Prior to towing it, we conducted inventory search of it." (Tr. at 10). Agent Rothermich testified that the Chevy was not searched based on probable cause and that he had no suspicion that any evidence of criminal activity would be found in the vehicle. (Tr. at 12, 15).

<u>Vehicle Inventory Search</u> - An administrative, routine, and warrantless search of the passenger area (including the glove compartment), trunk, and closed containers, prior to lawfully towing a vehicle.

## PROCEDURE

**1.     Authority to Tow**

A.     Officers have authority to tow and impound vehicles when authorized by city ordinance or state statute, or as part of the officers' community caretaking function. . . .

C.     Community Caretaking Function

1.     For a tow to be valid under this rationale, the following must be shown:

a.     The vehicle poses some threat or harm to the community, or is itself in danger; and
b.     Impoundment of the vehicle is in accordance with established department policy.

2.     In accessing whether a particular vehicle constitutes a hazard or is itself in danger, officers should consider:

a.     The degree to which the property upon which the vehicle is situated is under the control of the vehicle owner/operator; and
b.     The length of time the officer reasonably believes the impounded car would be left unattended.

## II.     Vehicles Which May be Towed

Assuming proper authority exists under **Section I.** above, the following vehicles may be towed and impounded:

6

I.      Placed in a detective or forfeiture hold status:

K.      Owned or operated by a person under custodial arrest for any charge.

(Gov't Exhibit 2).

TFO Cherry testified that the Chevy was impounded for safekeeping of the vehicle and its contents because the vehicle operator, Defendant Yeakey, was under arrest and the vehicle could not be left sitting on the private property of a third party. (Tr. at 22, 24).  The vehicle was impounded, and an inventory search was conducted to protect the valuables that might be in the vehicle.  (Tr. at 22).  The TFO acknowledged that, at that point, the Chevy had been secured and that he had the keys. (Tr. at 24).  TFO Cherry also stated that a "detective hold" was placed on the Chevy to allow detectives seventy-two hours to conduct further investigation and, for example, to obtain a search warrant for the Chevy before it was released to the owner. (Tr. at 23; Gov't Exhibit 2, ¶ V. Vehicle Holds).  TFO Cherry conducted the inventory search and located a Glock firearm in the center console and, in a backpack found on the backseat, a quantity of suspected marijuana, narcotic pills and a scale.  (Tr. at 16-17, 22-23).

7

Additional facts will be set forth as necessary during discussion of the motion to suppress.

## II.   Discussion

Defendant contends that the items seized from the Chevy Suburban on March 1, 2018, should be suppressed because the agents and officers lacked lawful authority to search the vehicle.  [Doc. 84].

### a.   Legitimate Expectation of Privacy

Prior to discussion of Defendant's challenge to the search of the Chevy Suburban, Defendant must establish that he had a legitimate expectation of privacy in the Chevy at the time of the search.  Defendant contends that circumstantial evidence establishes that he had borrowed the Chevy with the owner's permission.  [Id. at 1-2]. The Government disagrees.  [Doc. 4-7].  For the following reasons, the court finds that Defendant has not established a legitimate expectation of privacy in the Chevy.

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is Defendant's burden to prove that he has a legitimate expectation of privacy in the object of the search, that is, the Chevy on March 1, 2018.  See United States v.

8

Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." Hastamorir, 881 F.2d at 1559 (citation omitted).  In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 99 S. Ct. 421, 425 (1978)).  Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted).  In other words, "Fourth Amendment rights are personal and may not be vicariously asserted." Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995).

Defendant was not the registered owner of the Chevy Suburban.  (Tr. at 8, 10, 13-14).  Nevertheless, it is settled law in the Eleventh Circuit that an individual operating a vehicle which has been borrowed from the legal owner has a reasonable

9

expectation of privacy in the vehicle.  See United States v. Miller, 821 F.2d 546, 548-49 (11ᵗʰ Cir. 1987).  However, it remains Defendant's burden to establish, at least by circumstantial evidence, that he had the owner's permission to possess the Chevy Suburban.  See United States v. Flournoy, 2015 WL 13736234, at *2 (N.D. Ga. August 3, 2015) ("a defendant contesting a search of a borrowed car must establish with at least circumstantial evidence that he had the permission of the owner"), report and recommendation adopted by 2016 WL 4764823 (N.D. Ga. September 12, 2016); United States v. Beckford, 2010 WL 1487817, at *7 (N.D. Ga. February 2, 2010) ("Cases have found sufficient proof of standing where it was reasonable to infer that a defendant's possession of the vehicle was lawful and with permission."), report and recommendation adopted by 2010 WL 1489970 (N.D. Ga. April 13, 2010).

Defendant argues that such an inference can be drawn from the facts (1) that he was seen driving the Chevy to the Arnolda Avenue residence the morning of March 1, 2018;[5] (2) that he drove the Chevy, occupied by another male, Kennedy, to the VIP Wireless store later that morning; (3) that, when he was arrested inside the store, he possessed the keys to the Chevy; and (4) that there were no reports that the vehicle was

---

[5] Actually, Agent Rothermich testified, explaining a statement in the case report, that earlier the morning of March 1, 2018, "a male matching [Defendant's] description [must have been seen] arriving to" the residence in the Chevy Suburban.  (Tr. at 28).

10

stolen, either at the time of Defendant's arrest or later when a search warrant for the Chevy was served on the owner, Kevlynn Maddox.  [Doc. 84 at 1-2].  Defendant argues that surely the owner would have reported the Chevy stolen unless he had loaned it to Defendant.  [Id.].  That argument assumes too much and is purely speculative.

Furthermore, Defendant fails to point out what is missing from the evidence before the court, including, that Defendant never claimed to the agents and officers at the scene of the arrest that he had borrowed the Chevy on March 1, 2018, or offered to explain how he was in possession of the vehicle.  And he presented no evidence at the hearing that he was in lawful possession, for example, by testimony of the lawful owner.  In fact, Agent Rothermich testified that he never found out how Defendant came to be in possession of the Chevy. (Tr. at 28-29).  The evidentiary hearing record is void of any indication as to any relationship between Defendant and the owner, any association with the Arnolda Avenue residence for either Defendant or the owner or that, prior to March 1, 2018, Defendant had ever operated the vehicle.  Defendant must show more than mere possession of the Chevy and the vehicle's keys.  See United States v. Young, 2008 WL 11383979, at *11 (N.D. Ga. March 17, 2008) (citing United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003) (when the defendant is

11

vehicle's driver but not the registered owner, "mere possession of the car and its keys does not suffice to establish a legitimate possessory interest"); <u>United States v. Ponce</u>, 947 F.2d 646, 649 (2nd Cir. 1991) (a showing of an objectively reasonable expectation of privacy is not satisfied "simply by having been observed using the car")), <u>report and recommendation adopted in part and rejected on other grounds</u> 2008 WL 11383978 (N.D. Ga. July 1, 2008).

In <u>Flournoy</u>, the court found that the defendant had not established an objectively reasonable expectation of privacy in a vehicle owned by "ES." 2015 WL 13736234, at *3. Although the defendant stated at the scene that the vehicle was his or that the vehicle was his girlfriend's (who is not ES), the court noted that there "was no evidence offered by either side as to who ES is and what if any connection she had with the Defendant or his 'girlfriend.'" <u>Id.</u> There was also no evidence, beyond the "girlfriend's" silence at the scene when the defendant claimed ownership of the vehicle, to infer that the "girlfriend" gave the defendant permission to drive the car. <u>Id.</u> Concluding that the defendant had not met his burden, the court found the defendant's "statement lacked any indication as to what permission he believed he enjoyed, from whom, and specifically why he believed his 'girlfriend' (presumably the prostitute arrested at the scene) had the authority to loan the car to him, given that she

12

apparently was not the registered owner herself either." Id.  The court found, "This record is simply too thin for Defendant to prevail on an issue in which he shoulders the burden of proof." Id. (citing, *inter alia*, United States v. Sanchez, 943 F.2d 110, 114 (1st Cir. 1991) (finding a lack of standing "absent evidence showing that the defendant enjoyed 'a more intimate relationship with the car's owner or a history of regular use of the [car]'")); and see United States v. Sylvin, 2010 WL 1667655, at *1 (S.D. Fla. April 23, 2010) (noting that "the record is void of any evidence that the registered owner of the vehicle had given her permission to the Defendant Sylvin to use the car on the date the drugs and gun were found[,]" the court held that "[s]uch a person, operating a car . . . as occurred in this case, who cannot demonstrate that he owned, leased or had permission to use the automobile has no standing to raise a Fourth Amendment objection").

In Beckford, the court found that the defendant lacked a reasonable expectation of privacy in a vehicle that he had been seen operating earlier in the day. See 2010 WL 1487817, at *8.  Although the defendant "presented no evidence that at the time of the search, he possessed the BMW with the permission of the owner[,]" he argued "that the evidence that he was driving the vehicle earlier in the day - and the *absence* of evidence that he had used it without the permission of the owner - establishe[d] that

13

he [had] standing to challenge the search." Id., at *7 (emphasis in original).  The court concluded that, although the defendant "was given the opportunity to present evidence[,]" he failed to present evidence raising an inference that he possessed the BMW with the owner's permission.  Id.[6]

The shortcoming in Defendant's evidence is demonstrated by the court's decision in United States v. Robinson, 2015 WL 4928518 (N.D. Ga. August 18, 2015).  In Robinson, the evidence established that the defendant was not the owner of the vehicle in question, but, rather, that his wife, with whom the defendant lived, owned the car.  Id., at *12 & n.2.  Although neither the defendant nor his wife "specifically testified to establish Defendant's permission to drive the car[,]" the defendant argued "that the Court should infer permission because the car 'was properly insured, registered, it did not appear to be stolen, and [he] had the key.'"  Id., at *12 (citations

───────────────

[6]The court notes that the facts in Beckford are distinguishable because, at the actual time of the vehicle search, the defendant was not present and was actually operating another vehicle.  The BMW was searched several hours after the defendant was last observed operating it while it remained parked where the defendant had left it.  Id., at **1-2, 7.  Accordingly, the court further stated, "*Even if* I could conclude that Defendant . . . had a reasonable expectation of privacy while he was driving the BMW earlier in the day, I have no basis to conclude that his expectation of privacy was reasonable five or six hours later when the vehicle was parked behind a restaurant and Defendant . . . was in a different vehicle at a different location."  Id., at *7 (emphasis added).

14

omitted).  An officer also testified to having seen the defendant driving the vehicle on other occasions.  Id.  The court held, "Because there is evidence in the record showing that Defendant had a direct family relationship with and in fact lived with the car owner, because the Defendant has driven this car on multiple occasions, and because there is no indication that the car was reported as stolen, . . . enough evidence exists to support the Defendant's standing, *albeit barely*."  Id. (emphasis added).  Needless to say, the only similarity with the facts in this case - besides Defendant Yeakey's operation of the Chevy and possession of the keys - is his argument that, because the Chevy was not reported stolen, the court should infer he had permission to operate the Chevy.  Critical to the court's decision in Robinson are the facts that the defendant had "a direct family relationship with and . . . lived with the car owner . . . ." Id., at *12.  In the case before this court, Defendant Yeakey provided no information about his relationship with the Chevy's owner or how he came to be in possession of the Chevy.  Defendant did not even claim at the time of his arrest any interest in or relationship to the Chevy which might support a finding that he had a legitimate expectation of privacy in the vehicle.

15

For the foregoing reasons, the court finds that Defendant has not established a legitimate expectation of privacy in the Chevy and, therefore, cannot challenge the inventory search.

### b.    Impound and Inventory Search

Even if Defendant could establish that he had a legitimate expectation of privacy in the Chevy Suburban, he cannot prevail on his motion to suppress because TFO Cherry, following the written impound policy of the IMPD, properly impounded the vehicle and, prior to towing, conducted an inventory search. Defendant claims that the inventory search was based on TFO Cherry's "suspicion that evidence of crimes Yeakey had been charged with, would be found in the car." [Doc. 84 at 3]. Defendant relies on the facts that TFO Cherry knew who the owner of the Chevy was prior to impound, that the vehicle's passenger, Kennedy had a driver's license, was released and able to drive the vehicle, that the Chevy was parked legally on private property and was not impeding traffic and no one asked that the car be towed, that the car had a displayed tag, and that Defendant was not given an opportunity to secure his valuables in the car prior to impound or to make other arrangements for the car to be moved.

16

[Doc. 84 at 3-4].[7]  The Government contends that, having arrested the driver of the vehicle and being unable to contact the registered owner, TFO Cherry properly followed the authority granted in the IMPD impound policy.  [Doc. 81 at 7-9].  The Government is correct.

As a general rule, the Fourth Amendment requires police officers to obtain a warrant before conducting a search.  See California v. Carney, 105 S. Ct. 2066, 2069 (1985).  However, the search of the Chevy Suburban in this case occurred under circumstances that establish an exception to the warrant requirement.  "The Supreme Court has held that inventory searches, conducted pursuant to an established procedure, but without a warrant, on legally impounded vehicles are valid under the Fourth Amendment."  United States v. Glover, 441 Fed. Appx. 748, 751 (11th Cir. 2011) (citing South Dakota v. Opperman, 96 S. Ct. 3092, 3098-99 (1976)).  Accordingly, after lawfully taking custody of a vehicle, law enforcement officers may conduct an inventory search of the vehicle in order to protect the owner's property while it is in police custody, to protect the police from claims of lost or stolen property,

---

[7]Defendant's other "facts" dealing with the lack of probable cause, the failure to obtain a search warrant - although IMPD had the technology to do so, that Defendant did not consent to the search, and that he did not have access to the car at the time of his arrest are not relevant to the court's determination of whether the officers properly impounded the vehicle.  [Id.].

and to protect the police from potential danger.  See Colorado v. Bertine, 107 S. Ct. 738, 741 (1987); United States v. Jefferson, 451 Fed. Appx. 833, 835 (11th Cir. 2011) (the "government must establish, first, that the officers had the authority to impound the defendant's vehicle, and second, that the officers complied with departmental policy in conducting the search").  And an inventory search may be as thorough as necessary to accomplish the legitimate caretaking function of the police, that is, conducting a search "for the purpose of 'securing or protecting the car and its contents' . . . ."  Glover, 441 Fed. Appx. at 752 (quoting Opperman, 96 S. Ct. at 3098-99).

Because an inventory search must be conducted according to standardized criteria, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence."  Florida v. Wells, 110 S. Ct. 1632, 1635 (1990); see also Glover, 441 Fed. Appx. at 752 ("'An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory.'") (quoting United States v. Khoury, 901 F.2d 948, 958-59 (11th Cir. 1990) (finding that officer's search had no purpose other than investigation and stating that "a warrantless investigatory search may not be conducted under the guise of an inventory"), mod'd on other grounds, 910 F.2d 713 (11th Cir. 1990)).  However, "'the mere expectation of uncovering evidence will not vitiate an

18

otherwise valid inventory search.'" United States v. Crawford, 294 Fed. Appx. 466, 472 (11th Cir. 2008) (quoting United States v. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982)).  The record provides no support for Defendant's conclusory assertion that the inventory search in this case was based on a suspicion of discovering evidence related to Defendant's underlying crimes.  [Doc. 84 at 3].  Agent Rothermich testified that he did not have any suspicion that the Chevy contained evidence of any crimes much less claim that he had probable cause to support a search.  (Tr. at 12, 15).  He simply testified that a decision was made, pursuant to IMPD policy, to impound the vehicle because Defendant, who had operated the vehicle, was under arrest and the registered owner was not present.  (Tr. at 10).  And TFO Cherry also testified that the only reason the Chevy was impounded was pursuant to IMPD policy.  (Tr. at 20-21, 24).  There is no inference in the record before this court of any other motive.

The focus of Defendant's challenge to the inventory search in this case is his argument that the Chevy was not lawfully in the officers' custody because there was no justification for impounding the vehicle.[8]  Defendant is correct that before determining whether a valid inventory search was conducted, the court must first find

_____

[8]Defendant does not further contend that, even if the officers lawfully impounded the Chevy Suburban, the inventory search exceeded the scope authorized by the IMPD policy.  [Doc. 85].

that the decision to impound the vehicle was a valid exercise of police authority. United States v. Staller, 616 F.2d 1284, 1289 (5th Cir. 1980)[9] (Recognizing that valid safekeeping interests justify an inventory search, the court stated, "Obviously, before the need to protect these interests can arise, the police must have the right to take custody of the vehicle."); and see United States v. Foskey, 455 Fed. Appx. 884, 889 (11th Cir. 2012). The Eleventh Circuit Court of Appeals has provided the framework for resolving the question before this court:

> "Framed precisely, the critical question in cases such as this is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason."

Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992) (citation omitted).

The decision in Sammons arose out a case in which the driver of a vehicle, who had been arrested, "challenge[d] the motives of the arresting officers in impounding his vehicle when it was not impeding traffic or otherwise presenting a hazard to the public and when he specifically but unsuccessfully requested to be allowed to make arrangements for its disposition." Id. at 1542. The court held that case law did not

---

[9]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

AO 72A
(Rev.8/82)

require the officers to allow the defendant to make an alternative disposition of the vehicle; however, "that same case law requires that the decision to impound Sammons' vehicle have been made in good faith, based upon standard criteria, and not solely based upon 'suspicion of evidence of criminal activity.'" Id. at 1543. The court found that this same reasoning applied even if the arrestee's vehicle is not impeding traffic or otherwise a hazard - undermining Defendant Yeakey's arguments regarding the location of the Chevy Suburban at the time it was impounded. Id.; and see United States v. Baskin, 2016 WL 11432489, at *7 (N.D. Ga. August 24, 2016) ("law enforcement may lawfully impound a vehicle when they have arrested its occupant- even if the vehicle is not impeding traffic or otherwise presenting a hazard-'so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity'") (citation omitted), report and recommendation adopted by 2016 WL 5334754 (N.D. Ga. September 23, 2016); United States v. Daniels, 2015 WL 533253, at *12 (N.D. Ga. February 9, 2015) (same).

The starting point for the court's analysis is whether standardized criteria guided the decision to impound Defendant's vehicle. The IMPD policy was introduced into evidence and provides that a vehicle constitutes a public nuisance when "the operator

of [the vehicle] is unable to move such vehicle by reason of his incapacity from injury or arrest . . . ." (Gov't Exhibit 2, Definitions).  Additionally, officers may impound and tow a vehicle when authorized by city ordinance, such as when the vehicle is a public nuisance, or in the exercise of their community caretaking function, such as when "[t]he vehicle poses some threat or harm to the community, or is itself in danger; and [i]mpoundment of the vehicle is in accordance with established department policy." (Id., ¶ I. A. and C.).  And, under these circumstances, a vehicle may be impounded and towed when "[o]wned or operated by a person under custodial arrest for any charge" or when "[p]laced in a detective . . . hold status[.]"  (Id., ¶ II. I. and K.).  Agent Rothermich and TFO Cherry both testified that the decision to impound the vehicle was made because Defendant was under arrest and the lawful owner was not present and in order to secure - or for the safekeeping of - any valuables that might be found in the vehicle.[10]  (Tr. at 4, 8-10, 12, 20-22, 24).  The circumstances surrounding the

---

[10]Defendant's argument that the Chevy Suburban was secured, that is locked with the keys in the possession of the officers, at the time of his arrest does not take into account that the vehicle probably would have been left parked in front of the business after the businesses in the area closed and that vandals or others seeking entry into the vehicle after business hours would use means other than a key to gain entry. The officers had no way of knowing when or if the owner would be reached to otherwise secure the vehicle.

22

decision to impound the Chevy Suburban fell within the policy and constituted a reasonable exercise of the policy.[11]

Defendant's claims that the Chevy could have been released to Kennedy, the seventeen year old passenger, because he had a driver's license or that Defendant should have been allowed time to make alternative arrangements to secure the vehicle do not undermine the decision to impound the vehicle.  As TFO Cherry testified, the vehicle could not be released to Kennedy because he was not the registered owner which is a decision supported by the IMPD policy.  (Tr. at 14, 21-22).  The policy also supports the decision not to allow Defendant to make arrangements for the vehicle. The policy provides, when towing under the community caretaking function, that "the vehicle must be released . . . when:  1.  The *owner* of the vehicle is on scene and is in possession of a valid driver's license; 2.  The *owner* of the vehicle is arrested . . . but authorizes the release of the vehicle to another, properly licensed, person on the scene; or 3.  The *owner* of the vehicle arrives on the scene and authorizes the release of the vehicle to another, properly licensed, person on the scene." (Gov't Exhibit 2, ¶ III. G.)

---

[11]Alternatively, the Chevy Suburban was subject to being impounded because of the seventy-two hour "detective hold" placed on the vehicle by TFO Cherry.  (Tr. at 23; Gov't Exhibit 2, ¶ Definitions, Public Nuisance; ¶ II. I.; ¶ V.).

(emphasis added).  Those circumstances were not present in this case because, as noted, the owner was not present and could not be reached.

Moreover, the police are not required to allow a driver of a vehicle to make alternative arrangements in lieu of impounding the vehicle or to apply less intrusive means to securing a vehicle.  Defendant's arguments to the contrary, lacking any legal authority in support, are contradicted by case law in this Circuit.  See United States v. Dennis, 2018 WL 2994665, at *4 (S.D. Ga. June 14, 2018) (finding that, "[e]ven if, as [the defendant] argues, it may have been safe to leave the car where it was parked, that other less intrusive means, besides impoundment, could have been employed to prevent theft and ensure public safety does not necessarily render the decision to impound the vehicle unreasonable"); Daniels, 2015 WL 533253, at *14 (rejecting the defendant's argument that the officer's concern for the vehicle's contents could have been protected by contacting the lessee, the court stated that "police officers have discretion whether or not to impound a vehicle, and they do not violate an arrestee's Fourth Amendment rights merely by impounding a vehicle rather than permitting him to make alternative arrangements for the vehicle's disposition"); United States v. Melton, 2009 WL 2143638, at *3 (M.D. Ala. July 15, 2009) (stating that "'Bertine does not support [the defendant's] argument that police-as a constitutional matter-must

24

give a driver an opportunity to make his . . . own disposition of the vehicle, provided it is not presenting a hazard'") (citation omitted), <u>report and recommendation adopted by</u> 2009 WL 2383005 (M.D. Ala. July 31, 2009).

The decision to impound the Chevy Suburban was a reasonable application of the authority set forth in the IMPD policy.  Likewise, although not challenged by Defendant, the inventory search conducted by TFO Cherry followed the inventory policy.  He searched the passenger compartment, including containers found therein, and located the Glock firearm in the center console and the drugs and scale in a backpack on the backseat.  (Tr. at 22-23; Gov't Exhibit 2, ¶ IV.).

Under the facts and circumstances presented in this case, the decision to impound the Chevy Suburban and the inventory search conducted on the vehicle was reasonable and did not violate Defendant's Fourth Amendment rights.  <u>See</u> <u>Jefferson</u>, 451 Fed. Appx. at 835 (citing <u>United States v. Laing</u>, 708 F.2d 1568, 1571 (11th Cir. 1983)).  The items seized from the vehicle are admissible at trial.

## III.   Conclusion

For the forgoing reasons and based on the cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 65] to suppress be **DENIED**.

## **Defendant Coleman's Motion to Suppress Cell Phone Evidence**

Defendant Coleman filed a motion [Doc. 59] seeking to suppress evidence obtained from two cellular telephones, a pink iPhone 6S and a silver and white iPhone 6, seized during the execution of a state search warrant at 5812 Coppock Lane, Indianapolis, Indiana, on March 16, 2018.  On July 14, 2018, a federal search warrant was obtained to search the contents of the two cellular telephones.  [Doc. 77, Exhibit A ("Affidavit" and "Search Warrant")].  After the Government raised a challenge to Defendant's legitimate expectation of privacy to challenge the search of either cellular telephone, Defendant filed a supplemental brief in support of the motion to suppress in which he conceded that he did not have a legitimate expectation of privacy in the silver and white iPhone 6 but presented a basis for finding that he did in the pink iPhone 6S.  [Doc. 69 at 2-3].  The Government agrees that Defendant has a legitimate expectation of privacy in the pink iPhone 6S.  [Doc. 77 at 3].  Accordingly, the Court will only address Defendant's arguments and motion to suppress as directed to the pink iPhone 6S.   Defendant contends that the affidavit in support of the search warrant for the cellular telephone lacks probable cause because the affidavit does not establish a nexus between the cellular telephone and any criminal activity and that the good faith exception does not apply in this case. [Doc. 59].  The Government opposes the motion

26

to suppress arguing that a nexus between the criminal activity for which Defendant was arrested and the cellular telephone is set forth in the affidavit for the search warrant and, in the alternative, that the good faith exception does apply.  [Doc. 77].

## I.      Search Warrant and Affidavit

The search warrant, signed by Magistrate Judge Russell Vineyard, on July 16, 2018, sought authorization to search two cellular telephones, specifically "a pink iPhone 6S (Model: 11688, FCC ID: BCG-E2946A) . . ." [Search Warrant, Attachment A], for evidence pertaining to conspiracy to commit Hobbs Act Robbery, 18 U.S.C. § 1951, and use of a firearm in the furtherance of a crime of violence, 18 U.S.C. § 924(c), involving Rakim Coleman [Id., Attachment B].  The affidavit was submitted by Matthew Winn, a Special Agent with the FBI ("Affiant"), and began by outlining Affiant's law enforcement training and experience, including investigating groups engaging in violent crimes, and noting that based on his experience and training, he has "become familiar with the manner in which members of a criminal organization communicate, contact each other, and use electronic communication devices to store, transmit, and distribute information to one another and how they plan, organize, and carry out their criminal activity utilizing surreptitious meetings, at their residences and/or a predetermined location."  [Affidavit ¶ 1].  The Affiant stated that the pink

27

iPhone 6S (as well as the silver and white iPhone 6 found at the same time) was believed to belong to Coleman.  [Id. ¶ 2].

Affiant provided the following information in support of probable cause to search the iPhones.  He set forth the information regarding the FBI's investigation of one attempted armed robbery and two armed robberies at pharmacies on February 18, 2018, by a group of three black males and summarized the consistencies in the three robberies, including possession of handguns, use of zip ties to secure victims and physical descriptions and clothing worn by the suspects.  [Id. ¶ 6].  The attempted robbery, on February 18, 2018, at 12:29 a.m., at a CVS Pharmacy, in Roswell, Georgia, involved two black males (one of whom appeared to be using a cellular telephone), dressed in black, entering the store and asking an employee where baby wipes were located, and then going to the back of the store.  At that time, a third black male, dressed in black, entered and approached a female employee, who was kneeling while tagging merchandise.  This robber pointed a black semi-automatic handgun at the employee's head and ordered her to stand up.  When another robber stated they needed to leave, the robbers fled out the main entrance.  Responding police found two black zip ties by the main entrance.  [Id. ¶ 6 a].  Based on video surveillance in the store, Affiant provided detailed clothing descriptions for each robber noting that the clothing

each was wearing matched that of the robbers in other robberies on February 18, 2018. [Id.].

On the same date, at approximately 3:09 a.m., an armed robbery occurred at a CVS Pharmacy, in Macon, Georgia. Two black males, dressed in black, entered the store, and one robber asked an employee where baby wipes were located; both robbers then went to the back of the store. Then a third black male, dressed in black, entered and approached an employee pointing a black semi-automatic handgun at her and ordering her to the back of the store. Another robber pointed a gun at the manager also ordering him to the back of the store where both the manager and employee were secured with zip ties. The robbers, pointing a gun at the manager, demanded narcotics, and, when he said he did not recall the code for the safe, one robber struck the manager on the back of his head. When the manager advised that the safe code was in his cell phone, a robber retrieved the code, and the robbers opened the safe and took all of the narcotics. They fled through the pharmacy window. [Id. ¶ 6 b]. Responding police recovered pill bottles at the scene which, when analyzed, had the prints of both Rakim Coleman and David Yeakey. [Id.]. Again, Affiant provided detailed clothing descriptions for the robbers based on video surveillance noting that the clothing each

29

was wearing matched that of the robbers in other robberies on February 18, 2018. [Id.].

And on the same date, at approximately 6:56 a.m., an armed robbery occurred at a Rite Aid Pharmacy, in Cartersville, Georgia. [Id. ¶ 6 c]. Two black males, dressed in black, entered the store with a third black male, dressed in black, entering twenty to thirty seconds later. One robber approached a female employee at the cash register asking for the location of baby wipes and cough drops before pointing a handgun at her and securing her hands with zip ties and escorting her to the back of the store. The male employee present was also escorted by another robber at gun point to the back of the store and secured with zip ties. When the robbers encountered the pharmacist, a robber punched him and knocked him to the ground, and, with a gun pointed at the pharmacist, the robber said, "where the roxies at."[12] After the pharmacist opened the safe, the robbers secured the pharmacist with zip ties and stole the narcotics. After unsuccessfully attempting to flee through the pharmacy window, the robbers fled out the main entrance. [Id.]. And Affiant provided a detailed description of the robbers'

---

[12]Affiant noted, based on his training and experience, that "roxy" was the street term for oxycodone. [Id.].

30

clothing based on video surveillance and noted that the robbers' clothing and physical descriptions matched those for the other robberies. [Id.].

Affiant then recounted searching for and finding Coleman's and Yeakey's public Facebook accounts. [Id. ¶¶ 7-8]. Comparing the Indiana Bureau of Motor Vehicles ("IBMV") photograph of Coleman with the Facebook photograph for Coleman, Affiant said that they appear to be the same man. Affiant also noted that a Facebook photograph of Coleman wearing black clothing, as described in detail in the affidavit, was "consistent with those worn by one of the robbers during the robberies." [Id. ¶ 7]. And Affiant compared the IBMV photograph of Yeakey with the Facebook photograph for Yeakey and said that they appear to be the same man. Affiant also stated that a Facebook photograph of Yeakey in black clothing, as described in detail, was "consistent with one worn by one of the robbers during the robberies." [Id. ¶ 8]. On February 21 and 22, 2018, arrest warrants for armed robbery for Coleman and Yeakey were issued by Bibb and Bartow counties, in Georgia. [Id. ¶¶ 9-10].

On February 23, 2018, FBI received authorization for a tower dump for the three robbery locations, which was reviewed in March 2018. The FBI review indicated that telephone numbers 317-372-9164, 317-646-9028, 317-507-5759, 317-627-6287 and 317-665-2064 "were in the vicinities of two or more of the robbery locations and/or

31

were communicating with telephones that were in the vicinities of two or more of the robbery locations." [Id. ¶ 14]. An order was also obtained to authorize pen register/trap and trace with historical cell site records for these five numbers. [Id. ¶ 15]. The FBI determined that 317-372-9164, 317-646-9028, 317-507-5759 and 317-627-6287 were in the vicinities of at least two of the robberies around the time of the robberies and that 317-665-2064 was in Indiana around the time of the robberies as described in more detail. Affiant described which telephones using which of the five numbers were in the vicinity of each robbery location and which telephones were in communication with each other before and during one or more of the robberies. [Id. 16 a, b, c]. The FBI conducted searches for the telephone numbers and found that: (1) 317-507-5759 is subscribed to by Arthur Boyd, and is associated with Facebook account "Lil'Art StillKountin" (the photograph on the account matches the IBMV photograph of Boyd) and with a IMPD vehicle accident record as the telephone number for Boyd, date of birth January 27, 1999, [Id. ¶ 17 a]; (2) 317-372-9164 is subscribed to by Keith Andrews, Indianapolis, Indiana, and is associated with Facebook account "Bobby Drake" (the photograph is of a black male, late teens to mid-twenties) but no other public source data searches revealed further information for "Drake" (indicating the name "is possibly an alias"), [Id. ¶ 17 b]; 317-646-9028 is

subscribed to by Kathy Huffman, Indianapolis, Indiana, [Id. ¶ 17 c]; and 317-627-6287 is subscribed to by Gayle Flynn, Indianapolis, Indiana, [Id. ¶ 17 d].

Affiant also recounted the arrests of Yeakey and Coleman.  On March 1, 2018, Yeakey was arrested in Indianapolis, Indiana, at a cellular telephone store where Yeakey was attempting to sell a black iPhone 7S cellular telephone, number 317-513-0575. Yeakey was in possession of a 9mm handgun and a black Samsung flip phone which he broke in half before it was seized.  [Id. ¶ 12].  An inventory search of the vehicle driven by Yeakey revealed a Glock handgun and two baggies containing prescription narcotics that were consistent with the pills stolen in the robberies.  [Id.]. And, on March 16, 2018, Coleman was arrested at 5812 Coppock Lane, Indianapolis, Indiana, and a state search warrant was executed for the residence and the black 1994 Chevy Suburban parked at the location.  The following items were found during the search: magazines for various firearms, prescription pills consistent with those stolen during the robberies, black clothing consistent with the clothing worn by the robber believed to be Coleman and other black clothing consistent with the clothing worn by the robber believed to be Yeakey, as well as the two iPhones which are the subject of the search warrant.  [Id. ¶ 13].

33

Affiant finally provided an explanation of technical terms associated with a search of electronic devices and an explanation of the contents of electronic storage and about conducting a forensic analysis. [Id. ¶¶ 20-25]. Based on his training and experience, Affiant stated that he "believe[d] that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used, data that was sent or received; and other records that indicate the nature of the offense." [Id. ¶ 23 f].

## II.    Discussion

As noted, the focus of Defendant's challenge to probable cause is his claim that the affidavit fails to establish a nexus between the cellular telephone and any criminal activity. [Doc. 59].[13] According to Defendant, while the affidavit may establish probable cause to believe that he was involved in one or more of the armed robberies on February 18, 2018, none of the five telephone numbers associated with the

---

[13]Defendant makes a reference to a potential misrepresentation in paragraph 13 of the affidavit pertaining to his arrest pointing out that the paragraph could be read as indicating that all of the items seized were found in the Chevy Suburban which was not true. [Doc. 59 at 10-12 & n.4]. The court does not read that paragraph, which could have been better worded, as stating where any of the items were found during the search. For this reason, the court will not further address Defendant's arguments based on the prior search of the black 1994 Chevy Suburban on March 1, 2018, or thereafter as somehow undermining probable cause. [Id.].

robberies or telephone numbers contacted by the five telephone numbers show any communication with him or with the telephones found during the search.  [Doc. 59].

The issuing magistrate judge, in deciding whether to sign a search warrant, is "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)) (internal quotation marks omitted); and see United States v. Barron-Soto, 820 F.3d 409, 416 (11th Cir. 2016) ("'A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (citation omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329). For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant

35

process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same); United States v. Mobely, 2017 WL 10574358, at *12 (N.D. Ga. October 26, 2017) (noting that a "reviewing court examining a challenge to a search warrant applies a different standard, under which it accords 'great deference' to the judicial officer's finding of probable cause") (citation omitted), report and recommendation adopted by 2018 WL 5077755 (N.D. Ga. October 18, 2018).  In reviewing the issuance of a search warrant, the undersigned must determine only that the issuing judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam); Mobely, 2017 WL 10574358, at *12.  The validity of the warrant is considered based on the totality of the circumstances. See Brundidge, 170 F.3d at 1352.  And "the defendant bears the burden to show that the warrant is invalid." Mobely, 2017 WL 10574358, at *12.

As stated by the Eleventh Circuit Court of Appeals in United States v. Joseph, 709 F.3d 1082 (11th Cir. 2013),

36

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures," and it provides that "no Warrants shall issue, but upon probable cause." . . . A search warrant is supported by probable cause if the supporting affidavit establishes "a connection between the defendant and the location to be searched; [and] . . . a link between the location and criminal activity . . . ."

Id. at 1099 (citations omitted).  "This circuit has stated that probable cause exists if facts within the magistrate's knowledge and of which he had reasonably trustworthy information would warrant a man of reasonable caution in the belief that a crime was committed and that evidence is at the place to be searched."  Id. (citations and internal quotation marks omitted).  The Eleventh Circuit Court of Appeals, in considering the nexus between a residence and seeking evidence of the crimes under investigation, has stated:

> Probable cause to search a residence requires some nexus between the premises and the alleged crime. . . .  "The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." . . .  We have previously found that a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause.

United States v. Bradley, 644 F.3d 1213, 1263-64 (11th Cir. 2011) (quoting United States v. Jenkins, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (citation and alteration

omitted)).  The same reasoning applies to the instant search warrant in determining whether the affidavit establishes a nexus between the contents of the cellular telephone and the armed robberies for which Defendant was arrested.  The affidavit need not establish direct observation of use of the cellular telephone to facilitate the criminal conduct; instead, the "fair probability" that the contents of the cellular telephone may contain evidence of the crime may be established from the affiant's "expectation, based on prior experience and the specific circumstances of the alleged crime[.]" Id. at 1263; and see United States v. Kendricks, 2016 WL 11440141, at *13 (N.D. Ga. August 22, 2016) ("'the nexus between the objects to be seized and the premises searched[, in Kendricks, cellular telephones seized from the defendants upon arrest,] can be established from the particular circumstances involved and need not rest on direct observation'") (citation omitted), report and recommendation adopted by 2016 WL 5952743 (N.D. Ga. October 13, 2016); United States v. Raphael, 2010 WL 11484740, at *4 (S.D. Fla. November 18, 2010) (same), subsequently aff'd by 487 Fed. Appx. 490 (11th Cir. 2012).

The court finds that Magistrate Judge Vineyard had a substantial basis for finding that the affidavit presented a sufficient nexus between the pink iPhone 6S and the criminal conduct under investigation.  First, there is no dispute that the affidavit

AO 72A
(Rev.8/82)

presented probable cause for finding that Defendant Coleman participated in one or more of the armed robberies on February 18, 2018, in Macon and Cartersville, Georgia, and/or the attempted armed robbery in Roswell. Defendant's fingerprints were found at the scene of one armed robbery and a Facebook photograph depicts him wearing similar clothing to that of one of the robbers - and that clothing was found at the Coppock Road residence. [Affidavit ¶¶ 6 c, 7, 9-10, 13].[14] Information in the affidavit indicates that Defendants Coleman and Yeakey live in Indianapolis, Indiana, where they were arrested and have their photographs recorded by the IBMV. [Id. ¶¶ 7-8, 12-13]. Because the armed robberies occurred in Georgia, they - along with the third participant - obviously traveled from Indianapolis to Georgia to commit the robberies and returned to Indianapolis soon thereafter - Yeakey was arrested days later on March 1, 2018, in possession of handguns and prescription pills consistent with those stolen in Georgia. [Id. ¶ 12].

With respect to connecting the pink iPhone 6S with the criminal conduct, the affidavit establishes that during the attempted robbery, one robber was observed using a cellular telephone. [Id. ¶ 6 a]. More importantly, the tower dump establishes that four Indianapolis area code issued and subscribed telephone numbers, 317-372-9164

---

[14]The same is true for Yeakey. [Id. ¶¶ 6 c, 8-10, 12-13].

(subscribed to by Keith Andrews but associated with a "Robert Drake," apparently an alias), 317-646-9028 (subscribed to by Kathy Huffman), 317-507-5759 (subscribed to by Arthur Boyd) and 317-627-6287 (subscribed to by Gayle Finn), were identified as being in the vicinity of two or more of the robbery locations, which are located miles apart, around the time of the robberies, which occurred hours apart. [Id. ¶¶ 11, 14-17]. Additionally, those telephone numbers were in communication with each other before and during the attempted robbery and the two robberies. [Id. ¶ 16]. And the information in the affidavit supported the conclusion that the attempted robbery and the armed robberies were engaged in by the same three individuals. [Id. ¶ 6]. As the Government argues, the issuing magistrate judge could reasonably conclude that it is highly unlikely that these four out of state telephone numbers just happened to be in the same vicinity at the same time that the criminal activity was occurring but still have no connection to the activity. Therefore, the logical conclusion for the issuing Magistrate Judge to have drawn from these circumstances is that, whether or not subscribed to by Defendant or one of the other robbers, Defendant and the other two robbers were using those cellular devices to communicate regarding the ongoing criminal conduct. At least Defendants Coleman and Yeakey are from Indianapolis indicating any cellular device in their possession when engaging in the armed robberies

40

would likely have a 317 area code - in fact, at the time of his arrest, Yeakey was attempting to sell an iPhone 7S with the 317 area code. [Id. ¶ 12]. See United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v. Wiley, 475 F.3d 908, 916 (7th Cir. 2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted).  As stated by the court in Raphael, although "the affidavit here did not recount the fact that police actually observed conspirators using the phone-emails or text messages-prior to their seizure[, the court concludes that] it is still entirely reasonable to infer that Defendant [Coleman or one of his coconspirators] likely used them in setting up [the robberies], communicating plans, or getting directions to the [pharmacies]."  2010 WL 11484740, at *4.

Moreover, at the time that the search warrant was sought for the pink iPhone 6S, Affiant was not aware that cellular device - or the other iPhone seized - was not associated with one of the five telephone numbers located in the vicinity of the robberies and not was in communication with one or more of those cellular devices. The telephone numbers associated with the seized cellular devices were unknown.

41

Accordingly, it would have been reasonable for Affiant and the issuing Magistrate Judge to infer that one or both of those iPhones, if not actually associated with one of the five numbers, probably was connected to at least one of the five telephone numbers at the time the warrant was issued.  The cellular devices associated with the five telephone numbers were, as indicated by the affidavit, associated with individuals located in Indianapolis, Indiana - not Georgia, explaining why it was reasonable to conclude that the cellular telephones utilized during the illegal conduct would be found in Indianapolis, not Georgia, and found in the possession of one of the suspected armed robbers - along with the other evidence linking Defendant to the armed robberies found in the residence.  [Affidavit ¶¶ 13, 17].  And, therefore, the issuing magistrate judge reasonably concluded that evidence of that illegal conduct would probably be found on the seized cellular devices.  See Kendricks, 2016 WL 5952743, at *7 (noting that while a court may rely on an affiant's assertions based on knowledge and experience, the court stated that "it takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone"); Raphael, 2010 WL 11484740, at *3 ("Using experienced common sense, it was . . . quite logical for the Magistrate Judge to determine that all facets of the Defendants' cellular

42

telephones would contain evidence of criminal activity given the evidence of their involvement in the conspiracy.").

The affidavit for the search warrant established a nexus between Defendant's criminal activity and his pink iPhone 6S. And, even if the affidavit did not establish probable cause, contrary to Defendant's argument, the good faith exception applies in this case. In <u>United States v. Leon</u>, 104 S. Ct. 3405 (1984), and <u>Massachusetts v. Sheppard</u>, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective. In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court. With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. <u>Id.</u> at 1480 & n.4 (citations omitted). The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in

preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 104 S. Ct. at 3422). In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered. Id. at 1481.

The search warrant for Defendant's iPhone 6S was not "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" Leon, 104 S. Ct. at 3421 (citation omitted). The court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine. See United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998). The affidavit included details about Affiant's training and experience, about the attempted armed robbery and two armed robberies and linked Defendant to that criminal activity, about the association of Indianapolis area code telephone numbers with the armed robberies, and about the other evidence linking Defendant to the armed robberies seized, along with the iPhone, on the day of his arrest. This affidavit presented much more than conclusory, "bare-bone" assertions for consideration by the issuing judge. The affidavit provided factual details for the issuing magistrate judge to consider and evaluate. The law enforcement

44

officers were, therefore, entitled to rely upon that evaluation and determination that "given all the circumstances set forth in the affidavit before [the judge], there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 103 S. Ct. at 2332.

## III.   Conclusion

For these reasons, the court **RECOMMENDS** that Defendant Coleman's motion [Doc. 59] to suppress evidence seized from the pink iPhone 6S be **DENIED**.

### Defendants' Motions to Suppress Facebook Data

Defendant Coleman filed a motion [Doc. 60] to suppress data obtained from his account on Facebook pursuant to a court order issued under 18 U.S.C. §§ 2703 and 3123 [Doc. 83, Exhibit A ("Coleman Facebook Account Order")].  And Defendant Yeakey filed a motion [Doc. 63] to suppress information obtained from providers of electronic communication services but therein identified the specific order to obtain data from his account on Facebook, 1:18-MJ-182, as being the subject of his motion [Doc. 82, Exhibit A ("Yeakey Facebook Account Order")].

In his motion, Defendant Coleman seeks, along with IP address information and subscriber data, the suppression of any "stored communications" obtained by the court order.  [Doc. 60 at 2-3].  Defendant Yeakey's motion to suppress does not clarify

45

exactly what information obtained by the court order he is seeking to suppress. [Doc.

63]. In response, the Government states - and neither Defendant disputes - that the

Government did not obtain by means of either court order for Defendants' Facebook

accounts the contents of any "stored communications" or the contents of private

Facebook communications and data but, instead, for each Defendant obtained such

information by means of a search warrant for each account. [Doc. 82, Exhibit B

("Yeakey Facebook Search Warrant"); Doc. 83, Exhibit B ("Coleman Facebook Search

Warrant")]. In response to each court order, the Government states that Facebook

produced, as authorized by the orders, IP address data (based on the pen register and

trap and trace devices) for the accounts. [Doc. 82 at 7-8, Exhibit C; Doc. 83 at 7-8,

Exhibit C]. Defendant Yeakey has not sought to suppress evidence obtained pursuant

to the search warrant for his Facebook account. Defendant Coleman did file a motion

[Doc. 61] to suppress evidence from his Facebook account obtained by execution of

the search warrant; however, as stated *supra*, the Government has informed the court

and Defendant that it will not use any of the private communications or private content

from Defendant Coleman's Facebook account at trial. Accordingly, to the extent that

Defendants, in the motions under consideration [Docs. 60 and 63], seek to suppress the

contents of any "stored communications" or the contents of private Facebook

46

communications and data, the court recommends that the motions to suppress be denied as moot.

The court will address Defendants' arguments that the information, primarily the IP addresses, obtained based on the court orders from the pen registers and traps and traces installed on their Facebook accounts should be suppressed, pursuant to the Supreme Court decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), because a search warrant presenting probable cause for the "search" is required.  Defendants contend that they have a privacy interest in the "location" data obtained and that the good faith exception does not apply in this case.  [Doc. 60 at 16-18; Doc. 63; Doc. 85]. The Government responds arguing that 18 U.S.C. §§ 2703 and 3123 authorize use of a court order to obtain the IP addresses from Facebook, that Defendants do not have a legitimate expectation of privacy in that information, that the decision in Carpenter is not applicable, and that, in the alternative, the good faith exception does apply. [Doc. 82 at 2-7; Doc. 83 at 2-7].  After consideration of the arguments of the parties and based on persuasive case law addressing the parties' arguments, the court finds that Defendants do not have privacy interests in the IP addresses and related information obtained pursuant to the court orders and that, in the alternative, the good faith exception is applicable.

47

### a.      Legitimate Expectation of Privacy

Unless Defendants can establish that they have a legitimate expectation of privacy in the IP address and related subscriber information held by Facebook, they cannot challenge the disclosure of that information pursuant to the court orders.  See Cooper, 203 F.3d at 1283-84 (a defendant bears the burden to prove that he has a legitimate expectation of privacy in the object of the search); Hastamorir, 881 F.2d at 1559 (To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search.").  Defendant Coleman states that, "[w]ith respect to a Facebook account involving internet communications, the [pen register and trap and trace] devices collect addressing and routing information in the form of IP addresses captured after a successful login to the account[,]" which IP addresses - according to the application for the court order - "can be used to determine the location" of the device accessing the account. [Doc. 60 at 16].  Both Defendants contend that the information obtained by the Government presents the concerns raised and addressed by the Supreme Court in Carpenter and infringe on their privacy interests and that they can challenge the use of the court orders in lieu of securing a search warrant based on probable cause to obtain that information.  Defendants cite no legal authority issued

48

since the Supreme Court's decision in <u>Carpenter</u> to support their arguments and fail to do so apparently for good reason.  The court located persuasive authority that agrees with the Government's arguments but none that agrees with Defendants' contentions.

District Court Judge Brown in <u>United States v. Jenkins</u>, 2019 WL 1568154 (N.D. Ga. April 11, 2019), considered and rejected similar arguments as those made by Defendants Coleman and Yeakey and found that defendant Jenkins did not have a legitimate expectation of privacy in IP addresses and other subscriber information produced by Kik, Comcast and Sprint.  The court rejected the defendant's arguments to the contrary based on the <u>Carpenter</u> decision.  <u>Id.</u>, at **3-5 (the defendant contended that a search warrant was required to obtain "user and subscriber information for specific Kik accounts, user and subscriber information for accounts using specific IP addresses, location information, device information, IP address records and logs over a six month period, records of session times and durations, and telephone numbers associated with IP addresses on specific dates and times").  The court addressed the decision in <u>Carpenter</u> which held that "an individual maintains a legitimate expectation of privacy under the Fourth Amendment in cell-site location information ('CSLI') maintained by a cell phone service provider[,]" based in part on a finding that CSLI "technology tracks an individual's movement with near GPS-level precision."  <u>Id.</u>, at

*3 (citing Carpenter, 138 S. Ct. at 2218); and see United States v. Hood, 920 F.3d 87, 91 (1st Cir. 2019) (noting that the Supreme Court "explained that, given the location information that CSLI conveyed and the fact that a cell phone user transmits it simply by possessing the cell phone, if the government could access the CSLI that it had acquired without a warrant in that case, then the result would be that '[o]nly the few without cell phones could escape' what would amount to 'tireless and absolute surveillance'") (quoting Carpenter, 138 S. Ct. at 2218).  The Supreme Court, the district court in Jenkins noted, "held that 'an individual maintains a legitimate expectation of privacy in the record of his physical movement as captured through CSLI[,]'" 2019 WL 1568154, at *3 (quoting Carpenter, 138 S. Ct. at 2217), but the Court also "explicitly limited its holding to CSLI records because they track an individual's movements - a decision the Supreme Court described as 'narrow[,]'" id (quoting Carpenter, 138 S. Ct. at 2220).

District Judge Brown rejected defendant Jenkins' argument because he had not "shown that [the records being sought] contained the type of precise location information the Supreme Court held subject to an individual's legitimate expectation of privacy."  Id., at *4 (citing, as examples, that there was no showing that the defendant's movements were tracked "with near 'GPS-level precision" or that he was

tracked from a public thoroughfare into private living or business places or that the government obtained "'near perfect surveillance'") (citation omitted). Likewise, in the case before this court, besides making generalized and conclusory arguments about why Carpenter applies, neither Defendant offered any specific showing that the IP addresses and/or subscriber information obtained from their Facebook accounts actually raise the specific concerns identified in Carpenter.

The district court in Jenkins, relying on the Eleventh Circuit Court of Appeals decision in Rehberg v. Paulk, 611 F.3d 828, 843 (11th Cir. 2010), stated, "Law enforcement needs no warrant to obtain [subscriber] information." Jenkins, 2019 WL 1568154, at *4. And, with respect to IP address information for internet sessions, the court stated, "IP address information merely shows the location at which a device accesses the internet during a specific session [but i]t does not follow that person around. Indeed, it does not even identify the user, just the location of internet access." Id. (citing In re BitTorrent Adult Film Copyright Infringement Cases, 296 F.R.D. 80, 84 (E.D. N.Y. 2012)). As the court concluded, the IP address information "did not allow law enforcement to tract Defendant Jenkins' physical location over an extended period." Id. Other courts are in agreement with District Judge Brown's finding that IP addresses are distinguishable from CSLI data. See Hood, 920 F.3d at 92 ("the IP

address data that the government acquired from Kik does not itself convey any location information[; t]he IP address data is merely a string of numbers associated with a device that had, at one time, accessed a wireless network"); United States v. Monroe, 350 F. Supp. 3d 43, 48-49 (D. R.I. 2018) ("Although an IP address is a unique numerical identifier, . . . it can only provide 'the location at which one of any number of computer devices may be deployed,' . . . [and i]t does not, in and of itself, reveal a particular user's identity or the content of the user's communications.  Indeed, a 'subscriber to whom a certain IP address was assigned may not be the same person who used the Internet connection for illicit purposes.'") (citations omitted). Additionally, there is another distinguishing factor between IP address information and CSLI information not pointed out by the district court in Jenkins, that is, in contrast to CSLI which is generated "without the cell phone user lifting a finger[,]" "an internet user generates the IP address data that the government acquire[s] from [an electronic service provider] *only* by making the affirmative decision to access a website or application." Hood, 920 F.3d at 92 (emphasis added); and see United States v. Maclin, 393 F. Supp. 3d 701, 708 (N.D. Ohio 2019) (discussing obtaining subscriber information post-Carpenter and finding that such information is different from CSLI information because subscriber information does not provide precise location

information and unlike CSLI, which "follows the phone carrier around just by virtue of activating the cell phone[, s]ubscriber information requires an individual's active participation - the subscriber only captures information when the platform is used"). Defendant Coleman in fact concedes that, "[w]ith respect to a Facebook account involving internet communications, the [pen register and trap and trace] devices collect addressing and routing information in the form of IP addresses captured *after a successful login* to the account." [Doc. 60 at 16 (emphasis added)]. Again, Defendants have made no showing distinguishing the disclosure of IP addresses and subscriber information in this case from the factors that exclude this information from the "narrow holding" in Carpenter.

For these reasons, the court finds that Defendants lack a reasonable expectation of privacy in the information provided by Facebook in response to the 18 U.S.C. §§ 2703 and 3123 court orders.

### b.   Good Faith Exception

The Government contends, in the alternative, that, even if the court found that the ruling in Carpenter applies to obtaining IP address and subscriber information, the good faith exception to the exclusionary rule applies and the evidence is admissible at trial. [Doc. 83 at 6-7]. Defendant Coleman contends that the good faith exception

53

should not be applied in this case because the "Government was on notice" that Carpenter was on certiorari in the Supreme Court and that "there was a vigorous split in the judicial decisions" at the time that the court orders were obtained in this case in February 2018. [Doc. 60 at 17-18]. According to Defendant's argument, it does not matter to application of the good faith exception that Eleventh Circuit Court of Appeals' binding legal authority, see United States v. Davis, 785 F.3d 498 (11th Cir. 2015) (en banc), allowed the collection of CSLI data without a search warrant much less that the Supreme Court's narrow decision, as noted supra, did not address the type of data collected in this case. However, the court finds that these factors are important and that Defendant has presented no other basis upon which to base a finding of bad faith by the Government.

The decision in United States v. Pendergrass 2018 WL 7283631 (N.D. Ga. September 11, 2018), report and recommendation adopted by 2019 WL 102377 (N.D. Ga. January 4, 2019), addresses the issue of application of the good faith exception. In that case, the government obtained tower dump, that is, cell site, information during its investigation which the defendant sought to suppress relying on Carpenter. Id., at *13. The court noted that, at the time the information was obtained, the Government's conduct "was lawful under both the Stored Communications Act, 18 U.S.C. § 2701 et

*seq.* [("SCA")] and existing Eleventh Circuit authority holding that a search warrant was not required to obtain historical cell site data." Id.  The court assumed without deciding and "solely for the sake of argument that Carpenter applies to tower dumps[ but held that] the good faith exception to the exclusionary rule applies." Id.  The court noted that, although "Carpenter is controlling going forward, it can have no effect on [the defendant's] case here because the exclusionary rule's 'sole purpose . . . is to deter future Fourth Amendment violations.'"  Id. (citation omitted).  The court also noted that in United States v. Joyner, 899 F.3d 1199, 1204-05 (11th Cir. 2018), "the Eleventh Circuit ha[d] recently applied the exclusionary rule to hold that historical cell site records that the government obtained using an order obtained pursuant to the [SCA] pre-Carpenter were not subject to suppression." Pendergrass 2018 WL 7283631, at *13.  The court concluded that, because, at the time the order for the tower dumps weas obtained, "the law in this Circuit was that communications records obtained under the [SCA] could be obtained by a court order without the need of a search warrant[,]" the good faith exception applies.  Id., at *14; and see Jenkins, 2019 WL 1568154, at *5 (finding that even if the defendant had a legitimate expectation of privacy in the IP addresses and subscriber information, for the reasons stated by the magistrate judge, "this Court also concludes that - if the agents needed a warrant - they acted in the

55

objectively reasonable belief that their conduct did not violate the Fourth Amendment").[15]

Likewise, in this case, *at the time* the court orders were sought and obtained seeking the IP address data and subscriber information for Defendants' Facebook accounts, binding precedent in the Eleventh Circuit Court of Appeals allowed the use of a court order and did not require a search warrant. In Davis v. United States, 131 S. Ct. 2419 (2011), the Supreme Court held, "Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." Id. at 2429; and see United States v. Asghedom, 646 Fed. Appx. 830, 834 (11th Cir. 2016) (applying the good faith exception to the exclusionary rule to admit evidence obtained from a GPS tracking device affixed to a vehicle without a warrant "because law enforcement relied on then-binding appellant precedent[,]" citing United States v. Michael, 645 F.2d 252 (5th Cir. 1981) (*en banc*), overruled after the search in question by United States v. Jones, 132 S. Ct. 945 (2012)); Davis, 785 F.3d at 518 n.20 (holding in the alternative that, even if a warrant establishing probable

---

[15]The magistrate judge, relying on the decision to apply the good faith exception in Joyner, held that the same reasoning applied to the agents' actions in obtaining the IP addresses and other data, that there was no evidence of bad faith, and that the good faith exception applied. United States v. Jenkins, 2019 WL 2482171, at *3 (N.D. Ga. February 5, 2019).

cause was required to obtain cellular tower data, the good faith exception applied and that the defendant's motion to suppress was properly denied by the district court).  The Defendants have presented no persuasive reasons for not applying the Supreme Court decision in <u>Davis</u> to this case or for not following the Eleventh Circuit Court of Appeals decision in <u>Joyner</u>.

For these reasons, in the alternative, the court finds that the good faith exception applies in this case.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants' motions [Doc. 60 and 63] to suppress IP addresses and subscriber and related data from their Facebook accounts be **DENIED**.

### Defendant Coleman's Motion Suppress Cell Site Location Information

Defendant Coleman filed a motion [Doc. 62] to suppress cell site location information obtained by the Government for two cellular telephones, 317-628-1580 and 317-252-3348.   When the Government challenged Defendant's legitimate expectation of privacy to challenge the collection of the cell site location information, Defendant conceded that he lacked a privacy interest in 317-628-1580 but presented a basis, which the Government does not dispute, for finding that he had a legitimate

expectation of privacy in 317-252-3348.  [Doc. 69 at 4-5; Doc. 76 at 3].  Based on the

Supreme Court's decision in Carpenter, Defendant argues that collection of historical

and prospective cell site data for 317-252-3348 pursuant to the SCA and not pursuant

to a search warrant issued based on probable cause violated his Fourth Amendment

rights.  [Doc. 62 at 5, 8-9].  And, for the same reasons stated *supra*, Defendant argues

that the good faith exception does not apply.  [Id. at 9-10].   In response, the

Government first points out that the cell site location information was obtained

pursuant to a search warrant issued after a finding of probable cause as set forth in the

affidavit presented to the issuing magistrate judge as required by the decision in

Carpenter.[16]    [Doc. 76 at 3-8, Exhibit A ("Search Warrant") and Exhibit B

("Affidavit")].  And the Government argues in the alternative that, even if the court

determines that the magistrate issued a "court order" and not a "search warrant," then

the good faith exception is applicable.  [Doc. 76 at 9-10].  The court finds that the

magistrate judge did issue a search warrant based on a finding of probable cause

---

[16]The search warrant authorized not only the collection of historical cell site information but of prospective cell site information.  [Id.].  The latter category of data was not addressed by the Supreme Court in Carpenter, see 138 S. Ct. at 2220; however, for the purposes of ruling on the pending motion to suppress, the court will assume without deciding that the decision in Carpenter applies to both aspects of the cell site data collection.

58

thereby mooting Defendant's arguments based on Carpenter or that, in the alternative, the good faith exception is applicable.

## I.      Background Facts

On March 9, 2018, Magistrate Stephen Clase, Madison Circuit Court, 50th Indiana Judicial Circuit, State of Indiana, signed a document entitled, "SEARCH WARRANT," finding "based on probable cause that the information likely to be obtained[, that is, production of telecommunications records, location information, and the installation of a pen register and a trap and trace,] is relevant and material to an ongoing criminal investigation . . . ." [Search Warrant].  The magistrate then ordered, pursuant to 18 U.S.C. §§ 2703(d), 3122, 3123 and 3124 and to Indiana Code 35-33-5-12, the service provider to produce the identified telecommunications records, including location, for 317-252-3348 for a period of thirty days prior to the date of "this Warrant" and extending thirty days "after the signing of this Warrant . . . ." [Id.]. In support of issuance of the Search Warrant, Detective Brad Quakenbush ("Affiant"), presented an "AFFIDAVIT FOR SEARCH WARRANT" seeking an order pursuant to 18 U.S.C. §§ 2703(d), 3122, 3123 and 3124 and to Indiana Code 35-33-5-12 directing the service provider to produce specified information, including location, for 317-252-3348.  [Affidavit].

59

The following facts, in summary, were presented in support.[17]  Affiant begins by providing the background information about the FBI's investigation of the attempted armed robbery and the two armed robberies of pharmacies in Georgia on February 18, 2018, and the basis for finding that the same three black males committed those robberies.  [Affidavit ¶¶ 2-4].  Affiant next states that Rakim Coleman's and David Yeakey's fingerprints were found on the pill bottles recovered at the scene of one robbery and then discusses the information gleamed from their Facebook accounts resulting in the arrest warrants being issued for both men.  [Id. ¶¶ 5-10].  Affiant provides a shortened version of the arrest of Yeakey on March 1, 2018, only including that he was in possession of a firearm and $1,329 in cash and advising that Yeakey was thereafter transported to the Marion County Jail.  [Id. ¶ 12].

---

[17]Because Defendant does not point out any specific deficiencies with the probable cause set forth in the Affidavit but only conclusorily contends that "[n]one of the orders made the required findings necessary for the issuance of a search warrant[,]" the court will not detail the facts presented, especially the same facts that are summarized *supra* in addressing Defendant Coleman's motion to suppress evidence obtained from his cellular telephone.  The court does note that Defendant, in a short footnote, contends that the information sought for a period of six months before the alleged robberies on February 18, 2018, is overly broad.  [Doc. 62 at 9 n.7].  However, as the Government points out, the Search Warrant, issued on March 9, 2018, only provided for collection of historical cell site information for thirty days prior to issuance of the Search Warrant, that is, from on or about February 7, 2018, an entirely reasonable time frame.  [Search Warrant].  This contention requires no further discussion.

Affiant provided information about how inmates are allowed to make recorded calls using a designated pin assigned to each inmate and described calls made by Yeakey.  On March 3, 2018, using his pin, Yeakey made a recorded call to 317-910-6637, speaking to a female, Davonya - later identified as his sister.  [Id. ¶ 13].  Yeakey asked her to make a three-way call to "252-3348," and a black male, with "a very distinct low, raspy style voice," answered asking who was calling.  Yeakey responded, "David."  As interpreted by Affiant, based on his training and experience, during the following conversation, Yeakey was warning the black male about potential arrest and the black male indicated that he was trying to get out town and was in hiding.  [Id. ¶ 14].  The black male also asked Yeakey if he had said anything to the police, and Yeakey said he told them, "I didn't know nothing."  [Id.].  The men also made reference to a previous phone conversation since Yeakey's arrest; however, Yeakey's call logs did not show a call to "252-3348."  [Id.].  The black male also told Yeakey he was having trouble with his Audi, and Yeakey advised him to "get the truck out of tow," that is, the impound lot.  They also discussed that there were items, including clothing, in the truck belonging to Yeakey and a second unidentified black male that was of concern to that black male.  [Id.].  They made reference to the fact it was "spicy" on the streets which Affiant understood to mean heavily monitored by police.

61

Affiant stated that, based on his training and experience, he believed the men were alluding to the recent criminal activity resulting in Yeakey's arrest and that the black male needed to hide; therefore, Affiant thought Yeakey was speaking to either Coleman or the third unidentified robber.  [Id.].  Yeakey also asked the black male to give his mother $2,000 but not to rush to avoid problems which Affiant linked to the $1,329 seized from Yeakey on his arrest as being proceeds from the armed robberies. [Id. ¶ 15].

Affiant outlined his investigation of 317-252-3348 after this call.  In the jail phone system, he found a call to that number in the early morning hours of March 2, 2018, not associated with a designated pin but that he believed Yeakey made using his "free two minute call that all inmates get" upon processing into the jail.  [Id. ¶ 17]. Based on the voices and context of the conversation, Affiant believed that Yeakey called the same black male and advised him that he, Yeakey, had been arrested and instructed him to get into his Audi and to "lay low key" and that he, Yeakey, was about to be extradited to Georgia.  The black male said he would stay hidden and was upset about Yeakey's arrest.  [Id. ¶ 18].  Affiant then reviewed the Facebook account for Coleman and found a video of Coleman standing by a silver colored Audi sedan and,

based on Coleman's voice in the Facebook video, concluded that Coleman was the black male Yeakey had spoken to from the jail. [Id. ¶ 19].

Affiant concluded by stating he believed that Coleman owned 317-252-3348, that Yeakey had spoken to Coleman from the jail on two occasions but attempted to hide his contact with Coleman indicating that 317-252-3348 was likely involved in the recent criminal activity, and that Yeakey knew that the owner of the phone was likely to be arrested. Affiant, based on voice recognition and association with the Audi, linked Coleman to the phone. [Id. ¶ 15]. Based on the totality of the information, Affiant stated that he set "forward specific and articulable facts showing probable cause to believe that the information on the cellular tower locations, the physical location of [317-252-3348], and the subscriber information of telephone numbers in contact with [317-252-3348] will be relevant and material to an ongoing investigation." [Id. ¶ 17]. And Affiant, based on his training and experience, outlined how that information can assist the investigation and location of the suspects. [Id.].

## II.    Discussion

Without specifying why or in what manner deficient, Defendant contends that the "Search Warrant" signed by Magistrate Clase based on a factually detailed

63

"Affidavit for Search Warrant" presented by Affiant did not constitute a search warrant but, instead, was only an order under the SCA.  [Doc. 62 at 8-9].  Defendant is wrong.

"The Fourth Amendment provides, in relevant part, 'no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" United States v. Evans, 469 F. Supp. 2d 893, 896 (D. Mt. 2007) (quoting U.S. Const. amend. IV); and see United States v. Alfred, 2017 WL 9472898, at *7 (N.D. Ga. July 18, 2017) (same), report and recommendation adopted by 2017 WL 3575004 (N.D. Ga. August 17, 2017).  Accordingly, "[t]he defining features of a judicial search warrant are that:  (a) it must be issued by a judicial officer; (b) the judicial officer must find that there is probable cause to believe that evidence of contraband is present in the place to be searched; (c) the probable cause finding must be supported by the information contained in the oath or affidavit; and (d) the warrant must describe with particularity the places to be searched and the things to be seized." United States v. Kone, 591 F. Supp. 2d 593, 605 (S.D. N.Y. 2008) (citing Groh v. Ramirez, 124 S. Ct. 1284, 1289 (2004)).  The search warrant before this court has each of these features.

The Search Warrant is signed by Magistrate Clase of the Madison Circuit Court. [Search Warrant].  Magistrate Clase found "based on probable cause that the

64

information likely to be obtained[, that is, production of telecommunications records, location information, and the installation of a pen register and a trap and trace,] is relevant and material to an ongoing criminal investigation . . . ." [Id.].  The finding of probable cause is based on the Affidavit outlining a detailed factual basis for the magistrate's determination.   [Affidavit].   And the Search Warrant specifically identified the "place" to be searched, 317-252-3348, and the items to be seized. [Search Warrant].  No other information or directive or order is constitutionally (or for that matter, pursuant to Federal Rule of Criminal Procedure 41) required to be on the face of a valid search warrant.  See Johnson v. County of Contra Costa, 2010 WL 3491425, at *12 (N.D. Cal. September 3, 2010) (". . . facial validity is measured only by information that *must* be present on the face of a constitutionally sufficient search warrant, such as a particularized description of the place to be searched and the persons or things to be seized") (emphasis in original).

And the references to the SCA and the Indiana Code provision in the Search Warrant and Affidavit do not require a finding to the contrary.  In United States v. Williams, 2019 WL 1612833 (S.D. Ga. February 27, 2019), report and recommendation adopted by, 2019 WL 1601375 (S.D. Ga. April 15, 2019), the court rejected arguments based on Carpenter similar to those alluded to by Defendant

65

Coleman.  The defendant pointed out the warrants were "not prototypical search warrants."  Id., at *9.  Although the orders under consideration made reference to the SCA and the standard for issuance of a court order under that Act, the court noted that the "SCA authorizations purport to be based on probable cause" and that "the affidavits supporting the applications assert that the information provided 'show[s] probable cause to obtain'" the location data.  Id.  Based on the deferential standard accorded a judicial officer's probable cause determination, the court concluded that the court authorizations "expressly exceed[ed] the 'reasonable grounds' the [SCA] requires and satisf[ied] all of the substantive requirements for a warrant imposed by the Fourth Amendment.  Any technical defect in the form of the warrants is insufficient to require suppression."  Id., at **10-11.

And, in United States v. Stachowiak, 2019 WL 3292048 (D. Minn. April 23, 2019), report and recommendation adopted by 2019 WL 2560519 (D. Minn. June 21, 2019), the court also rejected the defendant's arguments that the orders authorizing pen registers, trap and trace devices and electronic tracking devices on mobile phone were not a search warrants and that suppression was required pursuant to Carpenter.  The law enforcement officer applied for two orders and submitted supporting affidavits outlining the details of his investigation and linking the identified mobile phones.  He

66

concluded "that the 'facts and circumstances' described in his affidavit were being relied upon for a showing of 'probable cause.'" Id., at **2-4 (citation omitted).  The judges signed the applications and orders which each provided that the issuing judge found "on the basis of the information submitted . . . that there is probable cause to believe that the information likely to be obtained . . . is relevant to an ongoing criminal investigation and possible violations . . . ." Id., at ** 3-4.  The court noted that the forms used to obtain the orders "did not use the words 'search warrant'" and that the "reference to statutes authorizing investigative tools that do not require a showing of probable cause raises concern." Id., at *6.  On the other hand, the court noted that, in the applications, the officer "indicated that he was seeking authorization for the installation of a precise location tool on the corresponding cell-phones 'based on probable cause'" and "the issuing judges indicated that 'on the basis of the information submitted by the applicant, there is probable cause to believe . . . .'" Id. (citations omitted).  Although the orders "frame probable cause in the terms of a belief that a requested pen register, trap-trace, and electronic tracking will be relevant to an ongoing investigation[,]" the court found that the language "in the tracking orders expresses the essence of the finding required by the Fourth Amendment,]" that is, "based on the facts presented by the applicant, that there is a fair probability that evidence" of a crime

67

would be found in the electronic data generated by the orders.  Id., at *7 (citations omitted).  The court also found that, unlike applications under the SCA, which "are not generally accompanied by the sworn affidavit of a law enforcement officer[,]" the application in this case contained a detailed affidavit which made a far greater showing than required by the SCA and indicated the officer's intention to make a showing of probable cause - an intention stated in his affidavit.  Id., at *8.  The judges' orders also concluded that such a showing had been made.  Id.  Accordingly, the court found "that the tracking orders issued here are consistent with Carpenter."  Id.[18]

Not only in the case before this court did the magistrate sign a document labeled, "Search Warrant," and made therein a finding of probable cause, but the Affiant presented an "Affidavit for Search Warrant" in which he contended he had established probable cause to obtain the telecommunications data being sought. [Search Warrant; Affidavit].  And, based on the details set forth in the Affidavit - which is not normally submitted with an application for a SCA order, the court finds that the magistrate had a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 103 S. Ct. at 2331.  Furthermore, in this case, the Search Warrant was also

---

[18]The district court decision cited by the Government, United States v. Gibson, 2019 WL 2265370 (N.D. Ind. May 28, 2019), also supports a finding that the order signed in this case satisfied the Fourth Amendment requirements for a search warrant.

68

sought based on Indiana Code 35-33-5-12, which requires a showing of probable

cause.  That provision states:

> A law enforcement officer or law enforcement agency may not use a real
> time tracking instrument that is capable of obtaining geolocation
> information concerning a cellular device or a device connected to a
> cellular network unless the law enforcement officer or law enforcement
> agency has obtained an order issued by a court *based upon a finding of
> probable cause to use the tracking instrument* . . . .

Ind. Code. Ann. § 35-33-5-12 (emphasis added).  Citation to this provision indicates

that the Affiant knew he had to present a basis for a finding of probable cause and that

the magistrate knew that any order could only issue based on a finding of probable

cause.

For these reasons, the court finds that the Search Warrant issued for the

telecommunications data for 317-252-3348 satisfied the Fourth Amendment as well

as the requirements set forth in Carpenter.  However, even if that was not the case,

contrary to Defendant's contention, the good faith exception applies in this case.

If the Government did not obtain a search warrant for the historical cell site data

and, for the purposes of this discussion only, the prospective cell site data obtained on

317-252-3348, then pursuant to the decision in Carpenter, the Government performed

an unconstitutional search.  However, as found by the Eleventh Circuit Court of

69

Appeals in Joyner, the good faith exception to the exclusionary rule applies.  899 F.3d at 1204-05.  As the court discussed in Joyner, although the Supreme Court decision in Carpenter overruled the binding precedent in the Eleventh Circuit under Davis, 785 F.3d at 518 (holding "that a § 2703(d) SCA order allowing government access to a cellular provider's records 'comports with applicable Fourth Amendment principles and is not constitutionally unreasonable'"), Carpenter did "not affect [the] alternative rationale in Davis -'that the prosecutors and officers . . . acted in good faith and therefore, under the well-established Leon exception [to the warrant requirement], the district court's denial of the motion to suppress did not constitute reversible error.'" Joyner, 899 F.3d at 1204 (quoting Davis, 785 F.3d at 518 n.20).[19]  Other circuit courts of appeal considering application of the good faith exception when the Government had obtained CSLI pursuant to an SCA order before the decision in Carpenter have also applied the good faith exception.  See, e.g., United States v. Beverly, 943 F.3d 225, 235-236 (5th Cir. 2019) (finding that "the deterrent rationale behind the exclusionary rule is inapplicable here: there is no reason to deter law enforcement

---

[19]The Joyner court rejected the defendants' argument that, because the Carpenter decision agreed with their position that a warrant was required for CSLI, the good faith exception does not apply and stated that "the fact that the Carpenter Court agreed with their Fourth Amendment theory does not affect the applicability of the Leon good faith exception . . . ." Id. at 1205.

officers from acting pursuant to federal statutes, especially those that have been upheld as valid by the relevant circuit court of appeals") (listing cases also applying the good faith exception)[20]; United States v. Adkinson, 916 F.3d 605, 611 (7th Cir. 2019) (finding that the good faith exception applies, the court stated that officers "reasonably relied on settled law that the information from T-Mobile was proper, and the Supreme Court had not yet decided Carpenter when the government received the information"); United States v. Chambers, 751 Fed. Appx. 44, 46-47 (2nd Cir. 2018) (although Carpenter required a finding that the CSLI obtained by an order issued pursuant to the SCA "did not comport with the Fourth Amendment[,]" the good faith exception applies because, at the time the information was obtained, the officers relied on binding precedent that use of that statute satisfied the Fourth Amendment - a conclusion that is not altered even if that statute is subsequently declared unconstitutional).

And, again, Defendant argues that the good faith exception does not apply because Carpenter was on certiorari, because there was a split in judicial decisions, and because of the Supreme Court decision in United States v. Jones, 132 S. Ct. 945 (2012)

---

[20]In particular, the court noted that "[o]f particular salience is the Sixth Circuit's decision in Carpenter II[,]" which on remand from the Supreme Court affirmed the defendant's conviction and "held that the CSLI evidence obtained pursuant to § 2703(d) was still admissible *against Carpenter himself* because of the good faith exception." Id. at 236 (emphasis in original).

71

(regarding real-time GPS tracking). Defendant claims that the Government attorney should have been notice of the upcoming decision in <u>Carpenter</u> and should have obtained a search warrant for the CSLI information. [Doc. 62 at 9]. As the court stated *supra*, according to Defendant's argument, it does not matter to application of the good faith exception that binding Eleventh Circuit Court of Appeals' legal authority, <u>see</u> <u>Davis</u>, 785 F.3d 498, allowed the collection of CSLI data without a search warrant. The court does not agree. And the Second Circuit rejected the defendant's argument that the decision in <u>Jones</u> placed the government "on notice" that a warrant was required and found that the decision in <u>Jones</u> was distinguishable. "The warrantless GPS tracking in <u>Jones</u> was unconstitutional because placement of the tracker on defendant's vehicle constituted a physical trespass: the '[g]overnment physically occupied private property for the purpose of obtaining information.'" <u>Chambers</u>, 751 Fed. Appx. at 47 (citation omitted). With orders obtained under the SCA, there is no physical trespass. <u>Id.</u> And as to whether the Government was otherwise on notice of the need for a warrant foreclosing reasonable reliance on <u>Davis</u>, the court finds that "[i]t would be indeed surprising to expect, much less demand, law enforcement officers [or government attorneys] to better predict how the Supreme Court will rule on an issue than all of the circuit courts of appeals judges who had ruled on the issue[,

including the Eleventh Circuit Court of Appeals,] up to that point." United States v. Boyle, 2018 WL 4635783, at *3 (E.D. Pa. September 27, 2018); and see Chambers, 751 Fed. Appx. at 46 n.1 ("Prior to Carpenter, all six courts of appeal to have considered the question had held that the government acquisition of electronic data from third parties was not subject to the Fourth Amendment warrant requirement.") (listing cases).  Because the Government obtained the CSLI information prior to the decision in Carpenter and based on binding Eleventh Circuit Court of Appeals precedent, the good faith exception applies.  See United States v. Turner, 2018 WL 7202483, at *2 (N.D. Ga. December 20, 2018) ("when the Government obtained CSLI in December 2017 pursuant to SCA court orders, it did so 'under this Court's precedent, within the bounds of the Fourth Amendment,' . . . and before the Supreme Court held otherwise in Carpenter[;]" therefore, "the Leon good faith exception to the exclusionary rule applies"), report and recommendation adopted by 2019 WL 453361 (N.D. Ga. February 5, 2019).

For all of the foregoing reasons, the court the **RECOMMENDS** that Defendant Coleman's motion [Doc. 62] to suppress cell site location information be **DENIED**.

73

### Defendant Coleman's Motion to Suppress Evidence from 5812 Coppock Lane

Finally, Defendant Coleman seeks to suppress evidence seized as the result the execution of a search warrant at 5812 Coppock Lane, Indianapolis, Indiana. [Doc. 66]. The Government challenges Defendant's legitimate expectation of privacy in the residence. Defendant filed a supplement brief in support of his standing to challenge the seizure of evidence from that residence. [Doc. 69]. In that brief, Defendant did not present any basis for finding that he had a legitimate expectation of privacy in the residence, but he contends, in the alternative, that the search warrant was obtained for the residence based on the allegedly unlawful telecommunications data obtained for his cellular telephone, 317-252-3348. [Id. at 5-8]. Defendant argues that, because that evidence was unlawfully obtained and the search of the residence resulted from exploitation of that evidence, he does not have to otherwise establish a reasonable expectation of privacy in the residence. The results of the residence search, according to Defendant, constitute fruits of the poisonous tree. [Id.]. The Government contends that Defendant still has not established a legitimate expectation of privacy in the residence and that Defendant's fruit of the poisonous tree argument fails because, as argued, the Government lawfully obtained the location data on Defendant's cell phone

AO 72A
(Rev.8/82)

or, in the alternative, the information is nonetheless admissible pursuant to the good faith exception.  [Doc. 78].

The court will not address whether Defendant's argument regarding his standing to challenge the search of the residence based solely on the fruit of poisonous tree doctrine does, as he contends, excuse him from establishing a legitimate expectation of privacy in the residence.  Accepting Defendant's argument for the sole purpose of ruling on his motion to suppress, Defendant does not have standing because the Government lawfully, pursuant to a search warrant, obtained the telecommunications data on his cell phone.  In the alternative, the good faith exception to the exclusionary rule applies and neither the telecommunications data obtained nor any evidence flowing from that data is subject to suppression under the Fourth Amendment.  See United States v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009) (the defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated").

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 66] to suppress evidence be **DENIED**.

## <u>Conclusion</u>

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Coleman's motion [Doc. 59] to suppress cell phone evidence, motion [Doc. 60] to suppress evidence seized pursuant to federal order for Facebook data, motion [Doc. 62] to suppress cell site location information; and motion [Doc. 66] to suppress evidence seized from 5812 Coppock Lane be **DENIED**; that Defendant Coleman's motion [Doc. 61] to suppress evidence seized pursuant to search warrant for Facebook account be **DENIED** as **MOOT**; and that Defendant Yeakey's motion [Doc. 63] to suppress information for Facebook account without a search warrant and motion [Doc. 65] to suppress evidence obtained pursuant to a warrantless vehicle search be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

AO 72A
(Rev.8/82)

**IT IS SO ORDERED and DIRECTED**, this 14th day of January, 2020.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE